| | |
|---|---|
| In re: | Chapter 7 |
| | Bky. No. 22-60172 (MER) |
| Travis L. Burg, | |
| Debtor. | |

| | |
|---|---|
| Erik A. Ahlgren, as chapter 7 trustee of the bankruptcy estate of Travis L. Burg, and Rachel and Tony Thoennes, | Adv. No. 24-_____ |
| Plaintiffs, | |
| v. | |
| Travis L. Burg and Nicole A. Burg, | |
| Defendants. | |

## COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 4

III.    PARTIES ............................................................................................................. 5

IV.     FACTS ................................................................................................................. 6

      A.      The Debtor Purchases Birchwood from the Thoenneses ........................................ 8

      B.      Debtor Hires Rodenwald to Shelter Assets from the Thoenneses ....................... 12

      C.      The Debtor and Rodenwald Make False Statements to the Thoenneses ............. 14

      D.      The Thoenneses Discover the Debtor's Fraudulent Scheme ............................... 18

      E.      The Debtor Conspires to Close Birchwood, Loot Its Assets, and File for
            Bankruptcy ............................................................................................................ 20

      F.      The Debtor Files for Bankruptcy and Continues to Lie, Steal, and Destroy
            Records .................................................................................................................. 22

      G.      Nicole Burg Aided and Abetted the Scheme to Defraud the Thoenneses ........... 24

            2017 Meeting with Attorney Donahue ................................................................. 24

            Establishment of Separate Bank Accounts .......................................................... 25

            Sham Employment at Birchwood ......................................................................... 25

            Expensing Personal Taxes and Misallocation of Tax Refunds ............................ 26

            Personal Credit Card Charges ............................................................................... 27

            Funneling Money to Consulting by Wade ............................................................ 28

            Diverting Funds for Homestead Improvements .................................................... 28

            Diverting Funds to Nicole Burg's New Business ................................................. 33

            Large Cash Transfers ............................................................................................ 33

            Expensing Employee Retirement Contributions .................................................. 34

            Grubworm Ownership .......................................................................................... 34

            Involvement with Randall State Bank .................................................................. 36

            Distributions to Minor Children ........................................................................... 36

            Manipulation of Birchwood Business Records ..................................................... 37

            Submitting False Financial Data to Falcon Bank and the Thoenneses ................ 37

            Fraudulently Inducing Settlement ........................................................................ 38

      H.      Nicole Burg Played an Important and Necessary Role in the
            Fraudulent Scheme ............................................................................................... 39

i

COUNT 1 Avoidance and Recovery of Salary Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550 Plaintiff:  Trustee Defendant:  Nicole Burg.................................................................................................................. 40

COUNT 2 Avoidance and Recovery of Cash Transfers Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550 Plaintiff:  Trustee Defendant:  Nicole Burg.......................................................................................................... 41

COUNT 3 Avoidance and Recovery of Grubworm Interest Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550 Plaintiff:  Trustee Defendant:  Nicole Burg.................................................................................................. 43

COUNT 4 Avoidance and Recovery of Homestead Transfers and Exemptions Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550 Plaintiff:  Trustee Defendants:  Travis Burg and Nicole Burg.............................................. 44

COUNT 5 Reduction of Homestead Exemption 11 U.S.C. § 522(o) Plaintiff:  Trustee Defendants:  Travis Burg and Nicole Burg........................................................... 47

COUNT 6 Objection to Homestead Exemption Federal Rule of Bankruptcy Procedure 4003(b)(1) Plaintiffs:  Trustee and Thoenneses Defendant:  Travis Burg........... 49

COUNT 7 Objection to Homestead Exemption Federal Rule of Bankruptcy Procedure 4003(b)(2) Plaintiffs:  Trustee Defendant:  Travis Burg ...................................... 50

COUNT 8 Aiding and Abetting Fraud Plaintiffs:  Thoenneses Defendant: Nicole Burg 51

COUNT 9 Aiding and Abetting Fraud Plaintiffs:  Thoenneses Defendant: Nicole Burg 52

COUNT 10 Aiding and Abetting Tortious Interference with Contract Plaintiffs:  Thoenneses Defendant:  Nicole Burg ................................................................. 53

V.      PRAYER FOR RELIEF .................................................................................. 55

ACTIVE 698437430v2

# EXHIBITS

| No. | Description |
|:---:|:---|
| 1. | March 19, 2014, Stock Purchase Agreement for the Purchase of Birchwood Electric and Birchwood Technology |
| 2. | March 19, 2014, Promissory Note for the Purchase of Birchwood Electric and Birchwood Technology |
| 3. | March 19, 2014, Security Agreement for the Purchase of Birchwood Electric and Birchwood Technology |
| 4. | March 19, 2014, Falcon National Bank Loan Agreement for the Purchase of Birchwood Electric and Birchwood Technology |
| 5. | March 19, 2014, Subordination Agreement between Falcon National Bank and Rachel and Tony Thoennes |
| 6. | March 1, 2014, Lease Agreement Between SHMILY Enterprises, LLC and Birchwood Electric |
| 7. | Plaintiff's List of Individuals and Entities Connected to Rodenwald |
| 8. | March 28, 2017, Escrow Closing Statement for the Sale of 41926, 190th Ave., Albany, MN 56307 (Burgs' old home) |
| 9. | Birchwood QuickBooks Transaction Journal – August 13, 2020, Journal Entry and Home Depot Receipt |
| 10. | Birchwood QuickBooks Report – All Birchwood Consulting by Wade Checks Entered by Nicole Burg |
| 11. | December 2018 Statement for Nicole Burg and Check 2000 |
| 12. | Birchwood QuickBooks Report – Retirement Contributions Entries Made by Nicole Burg |
| 13. | Birchwood QuickBooks Entries Deleted, Voided, or Modified by Nicole Burg |
| 14. | Birchwood QuickBooks Report – Birchwood Technology Security Refunds |
| 15. | Birchwood QuickBooks Report – Severance Payments |

ACTIVE 698437430v2

Plaintiffs Erik A. Ahlgren ("<u>Trustee</u>"), as chapter 7 trustee of the bankruptcy estate of Travis L. Burg, and Rachel and Tony Thoennes (together, "<u>Thoenneses</u>"), for their complaint against defendants Travis L. Burg (the "<u>Debtor</u>") and Nicole A. Burg ("<u>Nicole Burg</u>," together with the Debtor, the "<u>Burgs</u>"), state and allege as follows:

## I.    <u>INTRODUCTION</u>

1.    At the outset of this chapter 7 case, Plaintiffs Rachel and Tony Thoennes filed an objection to the Debtor's discharge under 11 U.S.C. § 727.   By its Memorandum Decision and Order for Judgment dated December 29, 2023, the Court denied the Debtor's discharge, finding that he and Wade Rodenwald orchestrated a fraud against the Thoenneses and destroyed business records to cover up the fraud.  (See Adv. No. 22-06011, ECF No. 62 ("Trial Order")).

2.    In March 2014, the Thoenneses sold their electrical contracting business, Birchwood, to the Debtor for $1.8 million.   The Thoenneses provided seller financing for approximately half of the purchase price.   The Debtor granted the Thoenneses a security interest in Birchwood's assets and capital stock to secure the seller financing.   The sales documents also restricted the Debtor to operate the business in the same manner as the Thoenneses until the seller financing was paid in full.

3.    Falcon National Bank ("<u>Falcon Bank</u>") financed the other half of the purchase price.   Falcon Bank also took a lien on all assets of Birchwood to secure the loan.   To close the transaction, Falcon Bank required the Thoenneses to execute a subordination agreement restricting payments on the seller financing if Birchwood did not have a debt service coverage ratio ("<u>DSCR</u>") of 1.25x or greater.

4.    From closing through December 2016, the Debtor and Birchwood complied with all terms of the sale documents and paid the Thoenneses each monthly payment due on the seller

financing.  Starting in January 2017, believing that he overpaid for the business, the Debtor and his high school friend, Wade Rodenwald ("Rodenwald"), devised a plan to suppress the DSCR, deplete Birchwood of cash and other assets, and leave the Thoenneses without any recovery on the remaining seller financing.

5.    The Burgs created a new entity, Grubworm LLC, to use as a vehicle to transfer funds from Birchwood to Rodenwald for investment in his house-flipping business.   At the objection to discharge trial, the Court found that the "Debtor and Wade Rodenwald's actions in creating Grubworm, selling homes, and having work done that was not paid for and was later deleted from QuickBooks were part of a plan to avoid paying the Thoenneses."  (Trial Order at p. 5).  The Burgs each owned 50% of Grubworm and Nicole Burg controlled the flow of funds from Birchwood to Grubworm for "investment" by Rodenwald.

6.    Nicole Burg testified at her deposition and at the Debtor's trial that she knew little about Grubworm and could not recall Grubworm's transactions with Rodenwald.   She feigned any knowledge of the fraudulent scheme and the business operations of Birchwood.  She testified that:  (a) she did not delete or make changes to invoices; (b) she did not know if Birchwood ever traded for services with other vendors and could not recall any instance that Birchwood traded for services; (c)  she did not recall if she ever received any money back from "investments" the Burgs made with Rodenwald; (d) she did not recall Birchwood's payments of her personal income taxes; and (e)  the separate accounts that she opened at Stearns Bank in January of 2017 were only "savings" accounts.

7.    Plaintiffs continued their investigation after the objection to discharge trial, including an examination of Rodenwald and Randall State Bank (the bank that provided funding to Rodenwald's house-flipping business).   From that investigation, Plaintiffs discovered that

ACTIVE 698437430v2

Nicole Burg played a fundamental role in the scheme to defraud the Thoennesses. Notwithstanding her testimony to the contrary, Nicole Burg knew all aspects of the fraudulent scheme and participated in the scheme from the outset.

8. Among other things, Nicole Burg attended the initial meeting with Rodenwald's counsel to devise a plan to "get rid of the prior owners." In January of 2017, she opened separate accounts at Stearns Bank in her name only to process "investments" to shelter funds with Rodenwald. Much like the "consulting" arrangement with Rodenwald, Nicole Burg's employment by Birchwood was nothing more than a pretext for diverting funds for investment and manipulating the DSCR to prevent payments to the Thoennesses. While "employed" at Birchwood, she deleted invoices and estimates relating to work Birchwood provided to Rodenwald and his house-flipping business. She managed the accounting of free services (and traded services) provided by Birchwood for Rodenwald and for construction of her new home. She diverted funds from the Burg's construction loan with Stearns Bank to Rodenwald, herself, and her children. And, like all the other participants in the fraudulent scheme, Nicole Burg deceived and misled the Trustee and the Court about her knowledge and involvement.

9. The Plaintiffs have filed separate adversary proceedings against Rodenwald (Adv. No. 24-06016) and Randall State Bank (Adv. No. 24-06017) for their roles in the fraudulent scheme. This complaint is filed against the Debtor and Nicole Burg to avoid any claimed exemption in their home, which was built with assets diverted from Birchwood. It also seeks to hold Nicole Burg responsible for her substantial participation in the fraudulent scheme.

10. Plaintiffs seek a monetary judgment against Nicole Burg for: (a) assets transferred by Birchwood to her or for her benefit with intent to hinder, delay, and defraud the Estate and its creditors; (b) her aiding and abetting the fraudulent scheme concocted by Rodenwald and the

3

Debtor against the Thoennesses; and (c) for her aiding and abetting Rodenwald's tortious interference with the contractual obligations owed by the Debtor and Birchwood to the Thoennesses under the sale documents. Finally, Plaintiffs seek to avoid as a fraudulent transfer any interest of Nicole Burg in Grubworm, including any proceeds held by the Estate from liquidating property nominally owned by Grubworm.

## II.    JURISDICTION AND VENUE

11.    On May 31, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

12.    This complaint is filed under Fed. R. Bankr. P. 4003(b) and 7001(1), (2), (7).

13.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a).

14.    This action arises in or is related to a case under title 11 of the Bankruptcy Code.

15.    All matters under 28 U.S.C. §§ 1334 and 157(a) have been referred to this Court by operation of Local Rule 1070-1, adopted by the District Court on July 27, 1984.

16.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).

17.    Venue is proper in this District under 28 U.S.C. § 1409.

18.    One or more of the Plaintiffs have standing to bring this adversary proceeding against the Defendants.

19.    Pursuant to Bankruptcy Rule 7008, Plaintiffs consent to entry of final orders or judgment by the Bankruptcy Court.

20.    All exhibits attached to this Complaint are incorporated by reference as if fully set forth herein.

4

### III.     PARTIES

21.     Plaintiff Erik A. Ahlgren is Trustee of the Debtor's bankruptcy estate.

22.     Non-parties Birchwood Electric, Inc. ("Birchwood Electric") and Birchwood Technologies, Inc. ("Birchwood Technology," and together with Birchwood Electric, "Birchwood" or the "Birchwood Entities") are Minnesota corporations.  The Trustee holds all the issued and outstanding shares of Birchwood as property of the Estate under 11 U.S.C. § 541.

23.     Plaintiffs Rachel and Tony Thoennes, a married couple domiciled in Minnesota, are the founders and former sole owners of Birchwood, which they sold to the Debtor in March 2014.  The Thoenneses currently hold an unperfected lien on all of Birchwood's assets and all issued and outstanding stock held by the Debtor.

24.     Defendants Travis Burg and Nicole Burg are natural persons, husband and wife, and domiciled in Minnesota.  Starting in March 2014, the Debtor was Birchwood's sole shareholder, its CEO, and a director.  Nicole Burg worked as a salaried employee of Birchwood starting in 2017.  The Burgs are members of Grubworm, LLC ("Grubworm"), each owning a 50% equity interest.

25.     Non-party Wade Rodenwald is a natural person domiciled in Minnesota. Rodenwald is employed as a realtor, but he mainly buys and sells "flip" houses and rental homes. Rodenwald is listed as manager, agent, or organizer of at least nine limited liability companies in Minnesota. Among them, he is the sole owner, manager, and member of Consulting By Wade, LLC ("Consulting by Wade"), which he formed in 2017 and whose sole customer was Birchwood. Plaintiffs took a Rule 2004 examination of Rodenwald on December 11 and 12, 2023.

26.     At all relevant times from December 2016 through the Petition Date, Birchwood Electric and Birchwood Technology were alter egos and mere instrumentalities of the Debtor.  The

Debtor, with assistance from Rodenwald and Nicole Burg, abused their corporate forms to defraud the Thoennesses and enrich themselves. Under the Debtor's control, the Birchwood Entities: (a) did not observe corporate formalities; and (b) falsified, deleted, or failed to maintain corporate records, in each case to conceal the fraudulent scheme directed at the Thoennesses. As detailed below, the Defendants repeatedly diverted assets from the Birchwood Entities for their own personal gain. Also as detailed below, the Debtor used the Birchwood Entities as a façade for his personal dealings with Rodenwald, including investments in real estate and cryptocurrency to launder funds outside the reach of the Thoennesses. Failure to treat the Birchwood Entities and the Debtor as alter egos of one another would be fundamentally unfair to the Plaintiffs.

### IV.     FACTS

27.     Much of the factual background to the fraudulent scheme was developed in the Debtor's earlier objection to discharge trial ("Trial"), including a 22-page stipulation of facts between the Debtor and the Thoennesses before trial. The Court also admitted 27 summary exhibits at Trial and heard testimony from many witnesses, including the Debtor, Nicole Burg, Rodenwald, and Rachel Thoennes.

28.     After a six-day trial in May and June 2023, by Memorandum Decision and Order for Judgment dated December 29, 2023, the Court denied the Debtor's discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5). The Court made specific findings from the Trial record in denying the Debtor his discharge. Among other things, the Court found that:

(a) Rodenwald "was known in the area for sheltering assets from the reach of creditors, ex-spouses, and the IRS." (Trial Order p. 4).

(b) "Rodenwald was helping [the Debtor] avoid paying the money he owed the Thoennesses from purchasing Birchwood." (Trial Order p. 4).

6

(c) The Debtor "would take money out of Birchwood to pay it to Rodenwald as a 'consulting fee' through Consulting by Wade," (Trial Order p. 4), which Rodenwald then used to invest in real estate and/or cryptocurrency.

(d) The Debtor "repeatedly provided free services to friends and family through Birchwood and then he would delete the QuickBooks records of the jobs." (Trial Order pp. 4-5).

(e) The "Debtor and Wade Rodenwald's actions in creating Grubworm, selling homes, and having work done that was not paid for and was later deleted from [Birchwood's] QuickBooks were part of a plan to avoid paying the [Thoennesses]." (Trial Order p. 5).

(f) The Debtor "caused Birchwood to do electrical work for Rodenwald, his properties, and homes owned by Grubworm. Birchwood paid expenses for parts and permits related to these properties. However, Birchwood was not compensated for most of these expenses, or for the work Birchwood performed." (Trial Order p. 5 (internal citations omitted)).

(g) The "Debtor transferred money out of [Birchwood] to diminish its value, lower the DSCR, and to avoid paying his debt to the [Thoennesses]." (Trial Order p. 11).

(h) The "Debtor transferred, removed, destroyed, or concealed Birchwood's assets and business/financial records in order to: 1) manipulate the DSCR; 2) deplete Birchwood's assets; 3) divert Birchwood's assets to himself, Rodenwald, Rodenwald's affiliates, and Grubworm; 4) avoid paying the [Thoennesses] amounts due and owing under the note; and 5) conceal the evidence of his fraudulent scheme." (Trial Order p. 14).

7

29.     From its continued investigation and examination of Rodenwald and Randall State Bank, Plaintiffs have discovered Nicole Burg's significant involvement in the fraudulent scheme. A summary of the factual record from the Trial and newly discovered evidence after Trial is set forth below.

**A.     The Debtor Purchases Birchwood from the Thoenneses**

30.     Birchwood Electric and Birchwood Technology provided electrical contractor services for new and existing residential homes.  The Thoenneses formed the Birchwood Entities and owned 100% of the outstanding capital stock in the companies.

31.     The Thoenneses employed the Debtor as a low-voltage technician at Birchwood starting in 2011.

32.     While the Thoenneses owned Birchwood, Tony Thoennes served as the fulltime master electrician and received an annual salary of $60,000 as of December 31, 2013. Rachel Thoennes served as the full-time officer manager and was responsible for billing and the daily operations of the businesses.  Rachel Thoennes received an annual salary of $50,000 as of December 31, 2013.

33.     On March 19, 2014, the Debtor purchased all the Thoenneses' capital stock in the Birchwood Entities pursuant to a Stock Purchase Agreement ("SPA") for $1.8 million, consistent with an independent business valuation performed by Robert Kovell, CPA/ABV, CVA, of the accounting firm Miller, Welle, Heiser & Co., LTD.  Mr. Kovell concluded that the Thoenneses' stock in Birchwood was worth $1,802,264 as of December 31, 2013.  A true and correct copy of the SPA is attached as **Exhibit 1**.

34.     Under the SPA, the Debtor paid the Thoenneses $878,500 in cash at closing, with the remaining purchase price balance of $921,500 was to be paid in monthly installments over ten

8

years pursuant to a Promissory Note ("Note") executed concurrently with the SPA. A true and correct copy of the Note is attached as **Exhibit 2**. The Note provides, in pertinent part, as follows:

> On this 19th day of March, 2014, the undersigned, <u>Travis L. Burg (the "Borrower")</u>, promises to pay to <u>Tony J. and Rachel M. Thoennes (collectively the "Lenders")</u>, the sum of <u>Nine Hundred Twenty One Thousand Five Hundred and 00/100 Dollars ($921,500)</u>, together with interest thereon at a rate of <u>Eleven Percent (11.00%)</u> per annum from the date above. Two Hundred Thousand and 00/100 Dollars ($200,000) will be on complete stand by with no interest until the end of the loan term (10 years), at which time the remaining balance will be due full.

> Monthly payments in the amount of <u>Nine Thousand Nine Hundred Thirty Eight and 66/100 Dollars ($9,938.66)</u> shall be made, over a <u>One Hundred Twenty (120) Month Term</u>, until the principal balance, plus interest and full standby has been repaid.

35.     The Note requires the Debtor to pay the Thoenneses' reasonable attorney fees upon any payment default: "Should any default occur in the payment set forth above, the undersigned agrees that he shall be responsible for reasonable attorney's fees, together with court costs, if placed in the hand of an attorney for the purposes of collection."

36.     The Debtor granted the Thoenneses a lien on the purchased stock under the SPA to secure repayment of the Note. (**Ex. 1**, Section 2B). The Debtor and the Thoenneses also entered into a Security Agreement ("Security Agreement") with Birchwood Electric. A true and correct copy of the Security Agreement is attached as **Exhibit 3**. Under the Security Agreement, Birchwood Electric pledged all its assets as collateral to secure the Debtor's obligations under the SPA and the Note. Further, pursuant to the terms of the Security Agreement, Birchwood Electric and/or the Debtor agreed as follows:

   (a) Birchwood Electric agreed to keep the assets, and any proceeds therefrom, free from any adverse encumbrance and not waste or destroy the assets (Section 1.08);

   (b) Birchwood Electric also agreed it would not sell or otherwise transfer any of the assets, except in the ordinary course of business (Section 1.07);

9

(c) The Debtor agreed that he would not provide materially false information to the Thoennesses on behalf of the Birchwood Entities or himself (Section 2.01C); and

(d) The Debtor agreed that he would not steal, damage or destroy any of the assets pledged as collateral to the Thoennesses (Section 2.01D).

37.    Pursuant to Section 3.D of the SPA, the Debtor further agreed that, so long as any amount remained unpaid under the Note:

V.    . . . [The Debtor] will not cause or allow [Birchwood] to create, incur, or assume expenses or indebtedness in excess of Five Thousand Dollars ($5,000.00) in any fiscal year without the prior written consent of [the Thoennesses].

VII.    [The Birchwood Entities], respectively, shall continue to operate as previously operated, substantially in the form and manner as previously operated, and shall not engage in other business activity without the prior written consent of [the Thoennesses].

(**Ex. 1**).

38. Pursuant to Section 5B of the SPA, the Debtor also agreed that:

The premises where [the Birchwood Entities] operate their respective businesses from is located at 12384 234th Street, Cold Spring, Minnesota (referred to as the "Business Premises"). The Business Premises is owned by SHMILY Enterprises, L.L.C. (referred to as "SHMILY"), which is wholly owned by the [Thoennesses], [the Birchwood Entities] currently lease the Business Premises from SHMILY, and all of the parties agree to continue operating under the terms of the existing lease agreement.

(*Id.*).

39.    Falcon Bank loaned Birchwood $902,000 (the "<u>Falcon Loan</u>") pursuant to a Business Loan Agreement ("<u>Falcon Loan Agreement</u>"). A true and correct copy of the Falcon Loan Agreement is attached as **Exhibit 4**. Birchwood used the Falcon Loan to pay $878,500 due by the Debtor to the Thoennesses at closing and $23,500 due to Falcon Bank for closing fees and costs. The Debtor personally guaranteed the Falcon Loan.

40.    As a condition to the Falcon Loan, Falcon Bank required the Debtor and the Thoennesses to execute a Subordination Agreement ("<u>Subordination Agreement</u>"). A true and

correct copy of the Subordination Agreement is attached as **Exhibit 5**. Under the Subordination Agreement, the Thoennes agreed that until the bank's loan was repaid in full, the Debtor's obligations to the Thoennes under the Note and the SPA would be subordinate to the Debtor's obligations to Falcon Bank. Notwithstanding this fact, the Subordination Agreement permitted the Debtor to make monthly payments of $9,938.66 to the Thoennes under the Note as long as Birchwood maintained a DSCR of 1.25x or greater. The Subordination Agreement does not define DSCR.[1] It only provides that the DSCR is "to be measured on a quarterly basis and is prior to distributions, including both the seller carry back [*i.e.,* the Note] and Falcon debt service requirements." (**Ex. 5**).

41.     In connection with the sale, the Debtor, on behalf of the Birchwood Entities, also executed a Lease Agreement with SHMILY Enterprises, LLC, an entity owned by the Thoennes, to lease a facility for Birchwood's operations in Cold Spring, Minnesota (the "SHMILY Lease Agreement"). A true and correct copy of the SHMILY Lease Agreement is attached as **Exhibit 6**. The SHMILY Lease Agreement required monthly lease payments of $3,000 for a term of five years.

42.     At the end of the 5-year term, the Thoennes offered Birchwood a monthly rent reduction of $500 to allow Birchwood more cash flow to start paying the Thoennes debt obligations under the Note. Instead, the Debtor moved Birchwood's business operations to inferior

---

[1] According to Investopedia: "The debt-service coverage ratio (DSCR) measures a firm's available cash flow to pay current debt obligations. The DSCR shows investors and lenders whether a company has enough income to pay its debts. The ratio is calculated by dividing net operating income by debt service, including principal and interest.

property owned or controlled by Rodenwald, paying double the rent offered by the Thoennesses.[2] Birchwood also made at least $13,674 in unreimbursed improvements to the Rodenwald facility in St. Joseph, Minnesota.

43.     As a result of the transaction with the Thoennesses, the Debtor became the 100% owner of the Birchwood Entities.  Birchwood was the sole source of income for the Debtor and his spouse.  The Defendants controlled all the books, records, and distributions from Birchwood. Under the Debtor's ownership, Birchwood made all monthly payments to Falcon Bank under the Falcon Loan and the Thoennesses under the Note for nearly three years.

44.     In January 2017, however, the Debtor abruptly stopped making payments under the Note and has never made any additional payments to the Thoennesses.  As of April 30, 2024, there is $794,050.34 in principal amount due under the Note, plus accrued interest of $481,587.66.  The Court also awarded the Thoennesses $596,702.98 in attorney's fees and expenses in connection with the Debtor's objection to discharge trial.  (Adv. No. 22-06011, ECF No. 67).

**B.     Debtor Hires Rodenwald to Shelter Assets from the Thoennesses**

45.     In late 2016, the Debtor invited his high school friend, Rodenwald, to his home to look at the SPA, Note, Security Agreement, Subordination Agreement and other sale documents (collectively, the "Sale Documents") related to the purchase of Birchwood.[3]  Rodenwald does not have any experience in the electrical contracting business or training in business valuations.  Yet,

---

[2]  Birchwood paid monthly rent of $2,500 to Rodenwald for the St. Joseph facility, but because this facility was too small, the Debtor caused Birchwood to pay Grubworm an additional $2,500 a month to rent storage space near the St. Joseph facility.

[3]  The Burgs and Rodenwald later met with Rodenwald's lawyer, Peter Donahue, to review the terms of the Sale Documents to develop a plan to "get rid of" the Thoennesses.

after reviewing the Sale Documents, Rodenwald told the Debtor that he had overpaid for Birchwood and agreed to help the Debtor in a scheme to shelter assets from the Thoennesses.

46.     Rodenwald, a real estate agent by trade, also works as an "advisor" to business owners and individuals seeking to shelter money from creditors, ex-spouses, and the taxing authorities.  His "services" are known in the community.  Rodenwald also runs a house-flipping business in Stearns County, Minnesota and surrounding counties.  Rodenwald has a broad circle of individuals and entities with whom he works on house-flipping transactions.  A list of his known affiliates is attached as **Exhibit 7**.

47.     Early in the scheme, Rodenwald introduced the Debtor and Nicole Burg to his attorney, Peter Donahue.  At the initial meeting with Donahue, the Debtor explained that he bought a business and told Donahue that "we're trying to come up with a solution to get rid of the old owners."  Among other things, they discussed formation of a new limited liability company to flip houses.  Rodenwald explained in his examination that "Nikki at the time, she was going to take on a separate entity as well and start cleaning houses, doing stuff because she was not happy with her current job."[4]  (12/11/23 Rodenwald Tr. 69:8-11).  During the meeting, Donahue, Rodenwald and the Burgs discussed the Debtor's purchase of Birchwood and the terms of the Sale Documents.  Donahue declined to assist the Burgs and Rodenwald.  Rodenwald and the Burgs then started working with Stinson.

48.     From January through April, 2017, the Debtor and Rodenwald negotiated with the Thoennesses to take a substantial discount on the remaining seller financing.  The Debtor threatened

---

[4]  Nicole Burg did not have a "job" for years before employment by Birchwood.  She was at home raising the Burgs' three small children.

ACTIVE 698437430v2

that he would file bankruptcy if the Thoennesses did not take a steep discount to the amount due under the Note.

49.     On April 17, 2017, the Thoennesses met with the Debtor, Nicole Burg, and Rodenwald at Rockville Café to discuss potential settlement of the remaining purchase price balance.  The Debtor and Rodenwald again pressured the Thoennesses to significantly reduce their loan balance so that the Debtor could continue to operate Birchwood.  In that discussion, Rodenwald stated, "Birchwood is an amazing business, and I would like to buy into it."  He further stated, "I have a lot of property assets that I can use as collateral for a new loan for Travis to pay you off" and that this "would be my way of buying into Birchwood."  Rodenwald's statements were deceptive and misleading.  He had no intention of buying into Birchwood under the circumstances and, in April 2017, he lacked the assets to secure a new loan to pay off the Thoennesses' loan.

50.     During the month of April, 2017, unbeknownst to the Thoennesses, the Burgs sold their home ███████████████████████████████.  The Burgs received $79,925.12 in proceeds from the sale ███████████████████████████████.  A true and correct copy of the closing statement ███████████████████████████████████████ is attached as **Exhibit 8.**

## C.     The Debtor and Rodenwald Make False Statements to the Thoennesses

51.     Starting in 2017, the Debtor also began to manipulate Birchwood's books and records to keep the DSCR below 1.25x.  He did this by inflating Birchwood's expenses and suppressing its revenue.  To inflate Birchwood's expenses, he gave himself raises, hired his spouse, caused Birchwood to pay personal income taxes, personal expenses, and manipulated Birchwood's accounting entries.  To suppress revenue, he caused Birchwood to provide free electrical

contracting services on his home, Rodenwald's home, and homes in Rodenwald's house-flipping business through the customer code "Rodenwald Rentals."

52.     The most glaring example of this manipulation is the Debtor's "expensing" his personal income tax payments in 2017, 2018, 2019, and 2021. This action was deliberate and designed to mislead the Thoennesses. The Debtor knew from conversations with Birchwood's accountants that payment of personal income taxes should be coded as "draws" in QuickBooks, the accounting software system. But instead, he would record them as "expenses" in his reporting to Falcon Bank and the Thoennesses, and then change the coding to "draws" after sending the reports.

53.     The Burgs also diverted value from Birchwood into their homestead to reduce revenue and increase expenses. In July 2017, the Debtor and Nicole Burg purchased land where they built a new home, a new "shed" and made substantial improvements on an existing barn and other outbuildings on the property. Birchwood paid for most of this work in 2017 and early 2018 by providing free labor and services or providing free services to subcontractors in exchange for work on his home. On information and belief, those subcontractors included Salzburn, H&S Heating, Mark Traut, Colorful Concepts Painting, Opatz Metal, Opatz Excavating, Bold Image, Klocker Construction, and Jarnot Cabinets. Nicole Burg managed all of the work on their home, bookkeeping relating to the trading of services, and use of construction proceeds (diverting some of those proceeds to "investments" with Rodenwald).

54.     The Debtor also caused Birchwood to perform "trades" or free services for his and Rodenwald's family and friends, including Aaron and Ashley Burg, Sheryl Burg, Judy Bialka, Zach and Rachel Bialka, Kimberly Wentland, Mark MacArthur, Al Scepaniak, Bret Garness, Jerome Tschida, Jim Heckendorf, Century 21, Aaron Scheel, Denny Niess, Taylor Hocum, Lucas

15

Larson, Higgins Family, Loren Thacker, Paul Sauerer, Al Scepaniak, TLC Enterprises, and others. Birchwood did not receive payment for work performed for these individuals, and the estimates and invoices associated with these jobs were later deleted from Birchwood's accounting software.

55.     Finally, the Debtor caused Birchwood to provide free services to Rodenwald in his house-flipping business.  As detailed below, Nicole Burg worked to manage the free services and cover up the evidence when the Thoenneses started to enforce remedies.

56.     Throughout the scheme, the Debtor repeatedly lied to the Thoenneses.  From January 2017 onwards, the Debtor or Nicole Burg emailed Birchwood's profit and loss statements to Falcon Bank each quarter, copying the Thoenneses.  These financial statements contained false and incomplete data, which Falcon Bank and the Thoenneses unknowingly relied on to calculate Birchwood's depressed DSCR.

57.     During the April 17, 2017 meeting, Rodenwald falsely stated that he wanted to become an owner of Birchwood and that he had many assets that could be used as collateral for a new loan to pay off the Note.  Rodenwald made these statements to keep the Thoenneses at bay while he and the Debtor implemented their fraudulent scheme.  And the false statements had their desired effect.  Ms. Thoennes wrote to the Debtor on April 28, 2017:  "On a side note, I'm really excited about your decision to bring Wade on as a partner.  I got the feeling at the meeting that you and he together are going to be a great team.  Thank you!"

58.     Between January 2017 and May 2021, Rachel Thoennes spoke with the Debtor by phone about ten to fifteen times about Birchwood's operations.  Each time, the Debtor falsely stated that he and Rodenwald were undertaking initiatives to improve Birchwood's DSCR so that it could meet the 1.25x threshold to resume payments to the Thoenneses under the Note.

16

59.     Frustrated and confused by the perpetually low DSCR, Rachel Thoennes met in person with the Debtor and Rodenwald at Caribou Coffee on July 16, 2019. Throughout this meeting, the Debtor and Rodenwald together used a laptop to view Birchwood's financial records on QuickBooks, but they refused Rachel Thoennes's requests to share the screen so she could see the same information. The Debtor and Rodenwald again falsely told Rachel Thoennes that they were attempting to improve the DSCR and pay down the Note. Among other things, the Debtor and Rodenwald falsely stated that they were working to increase revenue by growing Birchwood's base of paying customers and raising Birchwood's hourly rates. Most brazenly, they told Rachel Thoennes that they were working to reduce or eliminate excess or unnecessary expenses. In truth, the Debtor and Rodenwald were actively suppressing revenue by causing Birchwood to provide free services to the Debtor, Rodenwald, and their friends and business associates. And they were actively inflating Birchwood's expenses, including by funneling assets to Rodenwald through Consulting by Wade and providing free services to Grubworm, the Debtor's personal homestead, Rodenwald's house-flipping business, and other friends and family.

60.     During the July 2019 meeting at Caribou Coffee, the Debtor and Rodenwald also concealed and misrepresented payments from Birchwood to Consulting by Wade. The Debtor and Rodenwald had categorized the consulting fees as "professional fees" on Birchwood's profit and loss statement. When Rachel Thoennes asked why "professional fees" were so high, the Debtor and Rodenwald falsely attributed the sum to legal expenses—even though the driver by far was Birchwood's $10,800 quarterly ($43,200 annually) "consulting" payments to Consulting by Wade. When Rachel Thoennes asked if Birchwood was paying Rodenwald, the Debtor and Rodenwald falsely replied that the amount was "minimal."

17

61.     During the July 2019 meeting, the Debtor and Rodenwald also misrepresented unnecessary rent payments that they caused Birchwood to make to Consulting by Wade. Birchwood had been leasing an operations facility from the Thoennesses for $3,000 per month. To depress the DSCR and funnel money to Rodenwald, the Debtor and Rodenwald caused Birchwood instead to sublet smaller facilities from Consulting by Wade and Grubworm at about twice the price. Before Birchwood could even move into the new location, it had to pay over $13,000 for unreimbursed improvements. In response to Rachel Thoennes's inquiries, the Debtor and Rodenwald falsely stated that Birchwood was in a contract for deed for the property and hid the fact that Birchwood was only funneling more money to Rodenwald.

62.     The sole purpose of the July 2019 meeting was to keep the Thoennesses at bay, Rodenwald again falsely told Ms. Thoennes that he wanted to "buy into Birchwood" by helping the Debtor pay off the Note. Rodenwald had no desire to do so, and all his assets were tied up in his house-flipping business.

**D.     The Thoennesses Discover the Debtor's Fraudulent Scheme**

63.     For years, relying on the Debtor's and Rodenwald's continuous misrepresentations, the Thoennesses were unaware of the precarious situation at Birchwood. That finally changed in May 2021, when Rodenwald bragged to two local business owners that he was working with the Debtor to siphon and shelter Birchwood's assets.

64.     At Trial, these two business owners relayed a conversation with Rodenwald while he was wearing a Birchwood t-shirt. One testified: "Wade didn't feel like Travis had got a good deal. So, he felt like he was essentially helping Travis by consulting him and essentially taking money and sheltering it from Birchwood." (Trial Tr. 678:23-679:1). Rodenwald told the witness that he was helping the Debtor avoid paying money that the Debtor owed the Thoennesses. (*Id.* at

ACTIVE 698437430v2

679:2-5). The witness continued: "To my understanding it was essentially they would take money out of Birchwood as a consulting fee and they invest in real estate was my understanding." (*Id.* at 679:17-20

65. The Thoennesses found out about the conversation with Rodenwald shortly thereafter. On May 6, 2021, the Thoennesses' then-lawyer, Gordon Hansmeier, sent the Debtor and Birchwood a demand letter. It provided, in pertinent part, as follows:

> I have been contacted by Tony and Rachel Thoennes regarding the sale of Birchwood Electric, Inc. and the failure of receiving payments under the terms of the sale.

> As of April 18, 2021 the balance on the purchase price was $1,077,214.26. The balance as of June 18, 2021 will be $1,088,105.18 because I understand the bank suspended payments through June 18th. Interest accrues each month at a rate of $5,445.46 and your payment amount each month is $9,938.66. You have missed 54 payments.

> My clients have wanted to work with you but it is becoming apparent there is another agenda they aren't going to tolerate. You have retained Wade Rodenwald as a consultant who was telling local business owners how he is able to shelter money to prevent paying my clients each month. He said he is planning on waiting for the bank loan to be paid off before he tries to offer my clients pennies on the dollar for their loan. He was boasting about how he works with multiple businesses to hide money whether it be because of divorce or business debts or to avoid large tax bills. At the time he saying this he was wearing a Birchwood shirt and was using specific information that only pertains to my clients' agreement with you and Falcon National Bank.

> While my clients were giving latitude to the repayment because of a number of issues and excuses, their patience is now gone and they are turning to me to force the payments to a head.

> I would like to set up a meeting with you and whoever else you want to bring to discuss your plans going forward to resolve this.

66. Almost immediately after receiving the demand letter, Nicole Burg started deleting and modifying Birchwood's books and records, including invoices, estimates, and customers, to hide the Debtor's scheme and cover his tracks. She and the Debtor deleted items all related to the

19

free work and cash jobs that Birchwood provided to the Debtor, Rodenwald, and others as part of the Debtor's scheme to reduce the DSCR. The Defendants knowingly deleted this information from Birchwood's QuickBooks system with intent to conceal, falsify, and destroy any evidence of the fraudulent scheme.

67.     On July 22, 2021, the Thoenneses sued the Debtor in Minnesota state court for all amounts due under the Note. The Thoenneses alleged, among other things, that the Debtor was "diverting and manipulating income and expenses in violation of the sale agreement between Plaintiffs and Defendants."

68.     As a result of the lawsuit and the Thoenneses' discovery of the fraudulent scheme, the Defendants temporarily scaled back (but did not stop) their efforts to suppress the DSCR and loot Birchwood's assets.

**E.     The Debtor Conspires to Close Birchwood, Loot Its Assets, and File for Bankruptcy**

69.     On April 6, 2022, while the state court litigation was approaching trial, Falcon Bank notified the Debtor that Birchwood's DSCR was 3.06x and he could resume making monthly payments to the Thoenneses under the Note. A representative from Falcon Bank emailed the Debtor as follows: "Hi, Travis. Q1 of 2022, you had some great numbers! Your debt service coverage ratio is 3.06X, exceeding the minimum of 1.25X requiring seller note to be on standby." Birchwood's improved financial performance coincided with the Thoenneses discovery of the Debtor's scheme and their exercise of remedies.

70.     Rather than re-starting payments under the Note, however, the Debtor continued to hinder, delay and defraud the Thoenneses – falsely induce them to settle and compromise their claim, closing down Birchwood's business to destroy its value, and deleting additional business records to conceal their misconduct. The Debtor's goal – file his personal bankruptcy to shed his

20

debt to the Thoennesses, then open a new electric contracting business to continue his work with Rodenwald.

71.     On May 17, 2022, the day the state court trial was supposed to start, the Debtor falsely induced the Thoennesses to settle the litigation and reduce their claim.  In full satisfaction of the Note, the Debtor offered to pay the Thoennesses $900,000 in cash—$480,000 by June 16, 2023, and the $420,00 balance in installments over 10 years, still secured by the lien on Birchwood's assets and capital stock.  The outstanding amount due and owing on the Note at the time was approximately $1.15 million.

72.     The Thoennesses accepted the settlement offer primarily because the Debtor agreed to make a $480,000 cash payment by June 16, 2022.  The Thoennesses had not received any payments from the Debtor since December 2016, so receiving a large cash payment was a key term.

73.     After reaching this settlement, in lieu of having the trial, the parties entered the agreed judgment on the record before the trial court. The Debtor represented to the court that he understood the agreement and wanted to resolve the matter.  But the Debtor lied, and the stipulated judgment was just part of the continuing fraud.  As this Court found in the Trial Order: "In point of fact, [the Debtor] never intended to follow through on the settlement." (Trial Order p. 7). Instead, the Debtor had already started planning to shut down Birchwood, disburse its assets, and file for bankruptcy protection.

74.     On May 5, 2022, and May 11, 2022—just days before the settlement—the Debtor met with his and Rodenwald's accounting firm, WealthCare, Inc., for a "consultation on bankruptcy."  Then, from May 18, 2022, through May 31, 2022, the Debtor moved assets out of Birchwood—including, refunding customers accounts, prepaying service providers, and making

21

severance payments.  The Debtor also made sure to pay himself, his spouse, and Rodenwald.  The Debtor also deleted or destroyed Birchwood's records and emails to conceal his misconduct.

75.     On May 18, 2022, the Debtor, with assistance of Nicole Burg, refunded $7,763.39 to Birchwood Technology customers.

76.     On May 25, 2022, the Debtor formally closed Birchwood and terminated all employees.

77.     On or around May 26, 2022, the Debtor deleted Birchwood's Google Calendar and Google Drive, needlessly destroying all records of Birchwood's jobs, including when and where performed, and details of the tasks to be performed.

78.     Also on May 26, 2022, the Debtor requested that Birchwood's email server be deleted.   Birchwood's emails were hosted on an email server maintained by Leighton Broadcasting. A representative from Leighton Broadcasting warned the Debtor that if he deleted the email server, all Birchwood emails would be permanently deleted and lost. Despite this admonition, the Debtor needlessly deleted the records.

79.     On May 27, 2022, the Debtor, with assistance from his spouse, caused Birchwood to make severance payments to all recently terminated employees, including himself and Nicole Burg.

80.     Instead of working to pay his stipulated judgment, the Debtor destroyed Birchwood to hinder, delay, and defraud the Thoennesses.  Nicole Burg knew of the Debtor's actions and substantially assisted in and benefitted from the closing down of Birchwood.

**F.     The Debtor Files for Bankruptcy and Continues to Lie, Steal, and Destroy Records**

81.     On May 31, 2022, the trial court entered the stipulated judgment that the Debtor and the Thoennesses had agreed to on the record.  Just hours later, the Debtor filed a voluntary

petition for relief under chapter 7 of title 11 of the United States Code. This Court found: "Neither the Debtor nor Birchwood was in default or was behind on payments to any creditor besides the [Thoennesses] when the Debtor filed for Chapter 7 relief." (Trial Order p. 8).

82.     Two weeks after filing for bankruptcy, the Debtor continued his fraudulent scheme by starting a new electrical contractor business Edge Electric LLC ("Edge Electric"). Edge Electric provided the same services as Birchwood, and served the same group of Rodenwald related clients that received free work from Birchwood, but had no obligations to the Thoennesses under the Note. As the Court found in the Trial Order: "the Debtor has a new electrical contracting business–Edge Electric–built from the goodwill of Birchwood, but one that is notably unencumbered by his obligations to Plaintiffs." (Trial Order, p. 12).

83.     After filing for bankruptcy, the Debtor continued to modify, alter, and delete Birchwood's books and records to conceal his misconduct. In the Trial Order, the Court found that the Debtor removed or altered Birchwood records to "hide the evidence of his prior misconduct, self-dealing, siphoning of funds, and manipulations of the DSCR." (Trial Order, p. 16).

84.     The Debtor also repeatedly lied in his bankruptcy petition, during his Section 341 meeting, and at the Discharge Trial, again to conceal his fraudulent scheme. For example, the Court found that the Debtor made false statements when he: (a) "denied deleting or modifying QuickBooks entries or that he directed Mrs. Burg to do so before the petition date"; (b) "stated that the purpose and business of Grubworm was as a 'trenching company,' even though, at all times, Grubworm was a real estate investment and 'house flipping' enterprise"; and (c) "denied causing Birchwood to provide free services or trades to Rodenwald and the contractors who performed work on his homestead." (Trial Order, pp. 20-21).

23

85. Ultimately, the Court denied the Debtor's discharge. In doing so, the Court found that "the Debtor acted with fraudulent intent in transferring, removing, destroying, and concealing Birchwood's assets and business/financial records. The Debtor's actual pattern of conduct overwhelmingly supports a finding of fraudulent intent." (*Id.* p. 14). The Court further found that the Debtor—with intent to hinder, delay or defraud the Thoennes—"intentionally destroyed the value of his own Birchwood stock by taking equity distributions, siphoning funds, fraudulently manipulating the DSCR, and ultimately closing the business, laying off all employees, and destroying business records, including customer information." (*Id.*).

## G. Nicole Burg Aided and Abetted the Scheme to Defraud the Thoennes

86. Notwithstanding her earlier testimony, Nicole Burg was intimately involved in the Debtor's and Rodenwald's multi-year scheme to loot Birchwood and obstruct the Thoennes.

87. The Burgs and the Rodenwalds had a close relationship, pre-dating the Debtor's purchase of Birchwood. Nicole Burg first met Tiffany Rodenwald—Wade Rodenwald's wife—in 2008. They regularly socialized together, and organized playdates with their children. The Burgs and Rodenwalds even vacationed together.

### 2017 Meeting with Attorney Donahue

88. In early 2017, when the Debtor and Rodenwald first conspired to defraud the Thoennes, they met with attorney Peter Donahue. Nicole Burg attended the meeting. During the meeting, the Debtor explained to Donahue that he bought Birchwood and was "trying to come up with a solution to get rid of the old owners"—*i.e.*, the Thoennes. The parties also discussed forming a new limited liability company to flip houses with Rodenwald—*i.e.*, Grubworm. And the parties also reviewed the SPA, Subordination Agreement, Note, and other Sale Documents.

89. Nicole Burg therefore knew about her husband's plan to defraud the Thoennes from its inception. Rodenwald's examination also confirmed her role in assisting the Debtor with

24

investments into Rodenwald's house-flipping business. She started assisting in the scheme almost immediately.

**Establishment of Separate Bank Accounts**

90. In January of 2017, Nicole Burg opened separate savings and checking accounts at Stearns Bank in her name alone. Previously, the Defendants shared joint bank accounts. Nicole Burg used the accounts to funnel money out of Birchwood and beyond the reach of the Thoennes. Immediately after opening the account, the Burgs transferred the bulk of their joint savings—$15,000—to Nicole Burg's separate savings account. Thereafter, Nicole Burg routinely transferred money in and out of the accounts as part of the fraudulent scheme.

91. All money that flowed through Burg's Stearns Bank accounts either originated from Birchwood or was a direct result of the fraudulent scheme against the Thoennes.

**Sham Employment at Birchwood**

92. Later in 2017, Burg began working part-time at Birchwood. And in 2018, Nicole Burg became a "full-time" employee. She purportedly replaced Birchwood's prior office manager, Tahnee Rudolph, who had been fired for embezzling funds. However, Nicole Burg's employment was pretextual.

93. While employed by Birchwood, Nicole Burg did not work full-time hours, did not take over Rudolph's prior job duties, and did not perform any essential tasks for Birchwood. Instead, the true purpose of her "employment" was to assist the Debtor in his fraudulent scheme to avoid repaying the Thoennes.

94. Nicole Burg's sole focus as an "employee" was coordinating free services, deleting invoices and estimates relating to Rodenwald, and diverting funds for investment with Rodenwald. By labeling Nicole Burg as an "employee," the Debtor was able to pay her a salary and retirement contributions, which increased Birchwood's expenses and, in turn, reduced the company's DSCR.

25

95.     Between 2017 and 2022, Nicole Burg received $159,622 of salary and about $9,800 of retirement contributions from Birchwood.  These amounts substantially exceeded any legitimate value Nicole Burg provided to the business and were instead a means to move funds from Birchwood to the Defendants' pockets, to the detriment of the Thoennesses.  Her annual salary is summarized below:

| Nicole Burg's Compensation | |
| --- | --- |
| Year | Salary |
| 2017 | $11,514 |
| 2018 | $21,195 |
| 2019 | $30,919 |
| 2020 | $38,465 |
| 2021 | $37,363 |
| 2022 | $20,166 |
| Total: | $159,622 |

96.     All of Nicole Burg's wages were deposited into her separate accounts at Stearns Bank.  From these accounts, the Burgs then transferred some or all the wages to Rodenwald and/or Grubworm, to be laundered through real estate and cryptocurrency investments.

**Expensing Personal Taxes and Misallocation of Tax Refunds**

97.     In addition to her wages, Nicole Burg knowingly received other substantial benefits from Birchwood—to the detriment of the Thoennesses.  Between January 1, 2017, and May 25, 2022, the Burgs took $266,172.36 in distributions from Birchwood to pay their state and federal income taxes, which they filed jointly as a married couple.

98.     But instead of recording all such distributions as equity draws, the Burgs intentionally mischaracterized most as business expenses.  This artificially depressed Birchwood's DSCR calculation, which in turn enabled the Debtor to avoid paying amounts owing under the Note to the Thoennesses.  After reporting the false DSCR calculations to Falcon Bank, the Debtor and his spouse would then recategorize the tax "expenses" as equity draws.  Nicole Burg

26

knowingly participated in this scheme. On numerous occasions, she personally labelled the tax distributions as expenses in Birchwood's QuickBooks accounting records.

99. In addition to expensing personal taxes, the Burgs also overpaid their state and federal income taxes using Birchwood funds to further reduce the DSCR and divert additional cash. As a result of these tax overpayments, the Burgs received at least $40,041 in tax refunds, from which they deposited at least $36,270 into Nicole Burg's separate savings account at Stearns Bank. The Burgs then transferred some or all the refunds to Rodenwald and/or Grubworm, to be laundered through real estate and cryptocurrency investments. A summary of the refunds is set forth below:

| Summary of Tax Refunds | | |
|---|---|---|
| Tax Year | Category | Amount |
| 2018 | State Tax Refund | $3,771 |
| 2020 | State and Federal Tax Refunds | $20,373 |
| 2021 | State Tax Refund | $15,897 |
| Total: | | $40,041 |

**Personal Credit Card Charges**

100. Throughout her "employment" at Birchwood, Nicole Burg also routinely used the company credit to make personal purchases. From March 22, 2017, through May 24, 2022, she incurred $600 to $1,300 of monthly credit card charges for personal items, including for gas, groceries, fast food, drinks, meals at restaurants, Target purchases, Walmart purchases, personal vehicle expenses, personal cell phone expenses, home décor purchases, and other personal items. The Debtor also made thousands of dollars of purchases on Birchwood's credit card for family expenses.

101. All such credit card charges were coded in Birchwood's QuickBooks system as business expenses, thereby fraudulently reducing the company's DSCR calculation. By way of

27

example, on August 13, 2020, Nicole Burg used Birchwood's credit card to purchase home décor from Home Depot—then falsely coded it in Birchwood's QuickBooks accounting as an "office expense." Birchwood records related to this transaction are attached as **Exhibit 9**.

### Funneling Money to Consulting by Wade

102.    Nicole Burg also assisted the Debtor in funneling Birchwood money to Rodenwald and his entity, Consulting by Wade. For example, from 2018 through 2022, Nicole Burg caused Birchwood Electric to issue at least thirty-two checks to Consulting by Wade, totaling $159,667.00. QuickBooks reports for such checks are attached as **Exhibit 10**.

103.    At her deposition, Nicole Burg testified that she knew very little about the services that Consulting by Wade provided to Birchwood. She further testified that she was not involved in discussions or meetings with Rodenwald and the Debtor regarding Birchwood and had very limited interactions with Rodenwald. This testimony was false. According to Rodenwald, all his work for Birchwood was done at the direction of both the Debtor and Nicole Burg, and he answered to Nicole Burg whenever the Debtor was not present at Birchwood's offices. Rodenwald also testified that Nicole Burg was intimately involved in the billing and payment of fees to Consulting by Wade, and kept detailed quarterly time logs.

### Diverting Funds for Homestead Improvements

104.    Nicole Burg also was intimately involved in the Debtor's scheme to siphon money from Birchwood into their homestead and beyond the reach of the Thoenneses. As noted above, in 2017, the Debtor and Nicole Burg sold their primary residence and received net proceeds of $79,925.12. However, instead of applying these funds towards the purchase and construction of their new home, the Burgs deposited the money into Nicole Burg's separate account at Stearns Bank, then transferred almost all the funds Rodenwald for "investment." Rodenwald used the money to invest in real estate and cryptocurrency. (**Ex. 8**).

28

105.     The Burgs then began construction on their new home, located at 39089 County Rd. 3, Avon, MN 56310 (the "Avon Property").  The home is 3,068 square feet with four bedrooms, three bathrooms, a pool, and at least four detached structures.  On information and belief, its current market value is greater than $750,000.

106.     To finance the acquisition and construction, the Burgs obtained a $344,000 mortgage loan from Stearns Bank.  However, the loan was yet another step in the Debtor's scheme to defraud the Thoenneses.

107.     The Burgs only used about $200,000 of the loan proceeds to purchase and build the Avon Property.  They diverted most of the remaining loan proceeds to Rodenwald, for investment in real estate.  In October 2018, the Burgs deposited about $67,000 of loan proceeds into their joint checking, then transferred some or all of the funds to Rodenwald.  Several weeks later in November 2018, the Debtor and Nicole Burg deposited about $70,000 of loan proceeds into Nicole Burg's separate Stearns Bank savings account, then again transferred some or all the funds to Rodenwald.  Stearns Bank records showing these transactions are attached as **Exhibit 11**.   As before, Rodenwald laundered the money through various real estate transactions and purchases of cryptocurrency.  These transfers—totaling about $142,000—violated the terms of the construction loan, as all loan proceeds were supposed to be used for purchase and construction of the Avon Property.

108.     Because the Burgs did not use the construction loan proceeds to build the Avon Property, they had to fund construction some other way.  Birchwood filled this gap, in furtherance of the Debtor's scheme to defraud the Thoenneses.

109.     Birchwood Electric provided at least $62,194.59 of free services to the Avon Property.  Birchwood Electric paid for all permits, parts, and labor—and recorded these items as

29

business expenses in its books and records. But Birchwood never collected payment from the Burgs, which fraudulently depressed Birchwood's DSCR and enabled the Debtor to avoid paying the Thoennesses. The below table illustrates such free services:

| Free Services | | |
|---|---|---|
| **Date** | **Value Provided** | **Description** |
| 06/27/2017 | $18,492.00 | Estimate 5282 (deleted) |
| 06/27/2017 | $15,712.44 | Estimate 597 (deleted) |
| 08/14/2017 | $2,500.00 | ELE1708-04515 (no estimate/invoice) |
| 10/03/2018 | $12,490.15 | Estimate 5758 (deleted) |
| 12/04/2019 | $1,000.00 | ELE1912-01138 (no estimate/invoice) |
| 04/21/2020 | $2,000.00 | ELE2004-04831 (no estimate/invoice) |
| 04/21/2022 | $10,000.00 | ELE2204-06458 (no estimate/invoice) |
| | **$62,194.59** | |

110. Birchwood also directly paid at least $24,415.06 to third-party contractors, who performed various services at the Burgs' new home. Some of the payments were categorized as business expenses in Birchwood's records, which fraudulently depressed the DSCR. The remaining payments were categorized as equity draws, which looted Birchwood of assets. The below table illustrates these direct payments:

| Direct Payments | | | | | |
|---|---|---|---|---|---|
| **Payor** | **Payee** | **Date** | **Amount** | **Check No.** | **Category** |
| Birchwood Electric | H&S Heating | 01/10/2017 | $160.00 | Check 17097 | Expense |
| Birchwood Electric | H&S Heating | 05/22/2017 | $14,500.00 | Check 17243 | Equity Draw |
| Birchwood Technology | H&S Heating | 05/22/2017 | $6,029.00 | Check 1667 | Equity Draw |
| Birchwood Technology | Mark Traut | 08/03/2017 | $3,500.00 | Check 1676 | Equity Draw |
| Birchwood Electric | H&S Heating | 11/01/2017 | $161.06 | Check 17405 | Expense |
| Birchwood Electric | H&S Heating | 08/14/2019 | $65.00 | Check 18047 | Expense |
| | **Total:** | | **$24,415.06** | | |

ACTIVE 698437430v2

111.    Birchwood also traded at least $112,963.39 of services with other third-party contractors in exchange for work on the Burgs' new home.  As just one example, Birchwood Technology provided about $20,000 of services to Ryan Opatz, Opatz Metals and Opatz Excavating.  Birchwood Technology paid for all permits, parts, and labor—and recorded these items as business expenses in its books and records.  But rather than collect payment from the Opatz entities, the Opatz entities provided services at the Avon Property.  Trading services depressed Birchwood's DSCR calculation, which enabled the Debtor to avoid paying the Thoennesses.  The below table illustrates such trades:

| Traded Services | | | | |
|---|---|---|---|---|
| Birchwood | Trading Partner | Date | Value Provided | Description |
| Birchwood Technology | Opatz Metals and Opatz Excavating | 05/02/2017 | $6,432.50 | Estimate 454 |
| Birchwood Technology | Opatz Metals and Opatz Excavating | 05/04/2017 | $4,198.25 | Estimate 5139 |
| Birchwood Technology | Opatz Metals and Opatz Excavating | 09/25/2017 | $3,453.98 | Invoice 1023 |
| Birchwood Technology | Opatz Metals and Opatz Excavating | 11/21/2017 | $6,027.80 | Invoice 13317 |
| Birchwood Electric | Colorful Concepts | 03/20/2018 | $7,312.98 | Invoice 5562 |
| Birchwood Electric | Chad Klocker | 05/01/2018 | $13,525.50 | Estimate 5638 |
| Birchwood Electric | Colorful Concepts | 06/25/2018 | $1,104.18 | Invoice 13728 |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 10/25/2018 | $9,925.25 | Estimate 5778 |
| Birchwood Electric | Chad Klocker | 07/10/2019 | $2,444.24 | Estimate 5989 |
| Birchwood Technology | Jeremy& Emily Salzburn (H&S Heating) | 08/15/2019 | $12,102.00 | Estimate 634 and Invoice 1400 |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 08/27/2019 | $19,235.25 | Invoice 6025 |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 08/27/2019 | $8,267.15 | Estimate 6026 |
| Birchwood Electric | Chad Klocker | 09/16/2019 | $840.00 | Invoice 14684 |

ACTIVE 698437430v2

| Traded Services | | | | |
|---|---|---|---|---|
| Birchwood | Trading Partner | Date | Value Provided | Description |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 01/24/2020 | $11,228.61 | Invoice 15030 |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 04/13/2020 | $920.38 | Invoice 15198 |
| Birchwood Electric | Harvey Jarnot (Jarnot Cabinets) | 01/21/2021 | $200.00 | Invoice 15882 |
| Birchwood Electric | Harvey Jarnot (Jarnot Cabinets) | 01/29/2021 | $4,187.35 | Invoice 15904 |
| Birchwood Electric | Bold Image/St. Rosa Lumber | 02/03/2021 | $135 | Invoice 15915 |
| Birchwood Electric | Harvey Jarnot (Jarnot Cabinets) | 05/06/2021 | $1,422.97 | Invoice 16126 |
| | Total: | | $112,963.39 | |

112.    The Burgs directly benefited from all the improvements to their Avon Property funded by Birchwood.  Nicole Burg knowingly participated in the scheme.  She personally created many of the invoices and estimates for the free work and trades performed by Birchwood.  Then later, she personally deleted many of the invoices and estimates from Birchwood's books and records, to conceal the DSCR manipulation from the Thoennesses.  For example, on May 13, 2021, Nicole Burg deleted two estimates totaling over $30,000 of work that Birchwood provided at the Avon Property.

113.    From start to finish, the Burgs structured their construction of the Avon Property to siphon money from Birchwood with intent to hinder, delay, and defraud the Thoennesses.  The Burgs should have used the proceeds from the sale of their prior homestead and all construction loan proceeds to pay for their new home.  Instead, they diverted a substantial portion of the funds to Rodenwald for "investment," then caused Birchwood to cover the resulting shortfall.  This wrongfully depressed the DSCR and depleted Birchwood's assets—to the Thoennesses' detriment.

## Diverting Funds to Nicole Burg's New Business

114.    In anticipation of the Debtor closing down Birchwood, Nicole Burg diverted thousands of dollars from her Stearns Bank account into her new venture, Coley's Closet LLC ("Coley's Closet"). Coley's Closet is an online retailer of women's graphic t-shirts. Nicole Burg is the manager and the only member of Coley's Closet. She runs this business from a shed she and the Debtor built on their Avon Property in April of 2022 – less than two months before the Debtor filed for bankruptcy.

115.    Using funds she diverted from Birchwood, Nicole Burg made the following payments from her separate Stearns Bank accounts to pay for the construction of the Coley's Closet shed: (1) on April 2, 2022, she paid $11,076.80 to Craig James Concrete; (2) on April 12, 2022, she paid $1,838.12 to Town and Country Excavating; and (3) on April 18, 2022, she paid $19,790 to Bold Image Construction. Additionally, the Debtor caused Birchwood Electric to provide free electrical services for the improvement of the shed. According to electrical permits submitted by Birchwood Electric to Stearns County, Birchwood made approximately $10,000 of free improvements to the shed.

116.    On information and belief, Nicole Burg also stocked her business with equipment and inventory. For example, Between November 2021 and June 2022, Nicole Burg charged $10,585.42 to her Old Navy credit card for the purchase of inventory for Coley's Closet. She later paid-off this credit card with funds from her separate Stearns Bank accounts. In total, Nicole Burg used at least $53,290.34 of Birchwood's assets to launch her clothing business.

## Large Cash Transfers

117.    Nicole Burg also received or facilitated numerous large cash transfers from Birchwood. On January 10, 2020, Burg purportedly sold a van to Birchwood Electric for $10,800. However, the van had virtually no value.

33

118. On February 13, 2020, Nicole Burg also received a $23,000 check from Birchwood Electric for no consideration. She deposited the funds into her separate account at Stearns Bank, then transferred the money to Rodenwald for "investment" in real estate.

119. Neither cash transfer had any legitimate business purpose. Instead, Nicole Burg received the funds in furtherance of the Debtor's scheme to loot assets from Birchwood and defraud the Thoenneses.

120. From 2017 to 2021, Nicole Burg also assisted the Debtor in taking $164,479.50 in owner's draws from Birchwood via check. She either created or modified most of the QuickBooks entries for these checks.

## Expensing Employee Retirement Contributions

121. Nicole Burg also assisted the Debtor in wrongfully categorizing Birchwood employee retirement contributions as business expenses—which depressed the DSCR.

122. Birchwood administered a retirement plan for its employees. Under the plan, employees were permitted to contribute a portion of their wages to a retirement account. Yet in Birchwood's books and records, the company recorded these employee contributions as business expenses of Birchwood, even though the employees made the contributions from their wages.

123. Altogether, about $56,000 of employee retirement contributions were wrongfully categorized as business expenses, suppressing the DSCR. Nicole Burg personally entered most of the employee contributions as expenses in Birchwood's books and records. A QuickBooks report showing Nicole Burg's entries is attached as **Exhibit 12**.

## Grubworm Ownership

124. Nicole Burg also knowingly participated in the scheme to use Grubworm to defraud the Thoenneses. As the Court found in the Trial Order: "Debtor and Wade Rodenwald's actions in creating Grubworm, selling homes, and having work done that was not paid for and was later

34

deleted from [Birchwood's] QuickBooks were part of a plan to avoid paying the [Thoenneses]." (Trial Order p. 5). Notwithstanding her testimony, Nicole Burg was involved in all aspects of the scheme.

125. First, she was a 50% owner of Grubworm. At deposition, Nicole Burg testified that she never provided any capital contributions to Grubworm to justify her ownership stake, did not know who controlled Grubworm's books and records, and was not aware of any Grubworm "customers" aside from Birchwood. The sole reason the Debtor gave his spouse a 50% ownership stake was to shelter money outside the Thoenneses' reach.

126. Second, Nicole Burg personally deleted invoices, estimates, and other entries in Birchwood's books and records, to conceal the flow of money and free services from Birchwood to Grubworm.

127. Third, Nicole Burg personally facilitated several of Grubworm's real estate transactions. For example, using money from her separate Stearns Bank accounts, she funded Grubworm's $50,586.03 downpayment for a property in St. Joseph, Minnesota and $12,000 downpayment for a property in Moorhead, Minnesota. As noted above, all money that flowed through Nicole Burg's Stearns Bank accounts either originated from Birchwood or was a direct result of the scheme to defraud the Thoenneses.

128. Fourth, Nicole Burg personally participated in funneling money from Birchwood to Grubworm. For example, from 2019 through 2022, she caused Birchwood to issue at least thirteen checks to Grubworm totaling $40,000,00.

129. Through the Trial process below, Nicole Burg repeatedly testified that she had no knowledge of how Grubworm received funding for its real estate investments—despite having personally funded the $50,586.03 downpayment for the St. Joseph property and $12,000

35

downpayment for the Moorhead property. She also testified that she never received distributions from Grubworm. But this testimony was false. For example, on October 18, 2020, she received $20,000 from Grubworm's sale of the Moorhead property.

### Involvement with Randall State Bank

130.    Nicole Burg was also involved in procuring loans for Grubworm from Randall State Bank ("Randall Bank"). In a separate complaint, the Plaintiffs brought an action against Randall Bank for aiding and abetting the fraudulent scheme by providing loans to Grubworm, which, combined with funds looted from Birchwood, enabled the Debtor and Rodenwald to purchase houses for flipping. Grubworm existed solely as a vehicle for the Debtor and Rodenwald to launder Birchwood money and defraud the Thoenneses, and Randall Bank propped up the scheme by providing necessary liquidity.

131.    From 2018 to 2021, Randall Bank provided nine loans to Grubworm to finance its acquisition of seven properties. All seven acquisitions were related-party transactions, with Rodenwald or a Rodenwald-affiliated entity as the seller, Rodenwald setting the price and loan amount, and Rodenwald and the Debtor controlling Grubworm as the buyer. Randall Bank knew that each acquisition was a related-party transaction. Additionally, in approving the loans, Randall Bank breached its internal loan policies, violated Minnesota state law, and violated federal law.

132.    On several occasions, Nicole Burg personally went to a Randall Bank to deliver Grubworm's tax returns. Additionally, she socialized with AJ Johnson, the Randall Bank loan officer for all Grubworm loans. At deposition, Nicole Burg falsely testified that she had no involvement with the loans and only met AJ Johnson once.

### Distributions to Minor Children

133.    Nicole Burg also caused Birchwood to make payments totaling $3,600 to her three minor children, who were all under the age of 13. She entered the payments into the company's

36

QuickBooks system and created the checks. The children provided no actual benefit to Birchwood. Instead, the payments were part of the scheme to depress Birchwood's DSCR and divert funds from the company to her and her family.

### Manipulation of Birchwood Business Records

134. From 2017 until 2022, Nicole Burg also routinely assisted the Debtor in falsifying, deleting or modifying Birchwood's business records to conceal evidence of the scheme to defraud the Thoenneses. As noted above, she personally mislabeled various entries in Birchwood's QuickBooks system as business expenses—including personal tax distributions, personal expenditures, and employee retirement contributions—which depressed the DSCR. She also created and deleted various invoices, estimates, and other entries for free work and trades relating to her homestead, Grubworm properties, Rodenwald personal home, and friends and family. A compilation of QuickBooks reports showing the entries that Nicole Burg deleted, falsified, or modified is attached as **Exhibit 13**.

135. Nicole Burg's manipulation of Birchwood's business records accelerated in May 2021, right after the Debtor received the demand letter from the Thoenneses' lawyer regarding their discovery of the fraudulent scheme. In the days after receiving the letter, Nicole Burg personally deleted QuickBooks entries for fourteen estimates and nine invoices with a combined value of $104,812.47. These records related to free services and trades that Birchwood provided to, among others, the Burgs themselves, Rodenwald, Rodenwald entities, and friends and family.

136. At deposition, Nicole Burg testified that she never deleted any entries from Birchwood's QuickBooks system. This testimony was false.

### Submitting False Financial Data to Falcon Bank and the Thoenneses

137. Nicole Burg also assisted the Debtor in submitting false financial information to Falcon Bank and Thoenneses. As noted above, each quarter, Birchwood emailed a profit and loss

37

statement to Falcon Bank, copying the Thoennesses, which Falcon Bank used to calculate the company's DSCR. Nicole Burg was routinely copied on these emails and on several occasions, initiated the email.

138.     These communications were instrumental to the fraudulent scheme. By sending Birchwood's quarterly reports with inflated expenses and artificially depressed income, the Debtor and Nicole Burg ensured that the company would not be able to reach the 1.25x DSCR required to restart payments to the Thoennesses.

139.     In her testimony, Nicole Burg downplayed her interactions with Falcon Bank as a Birchwood employee. She testified that she only contacted the bank when there was a problem with a Birchwood check. This testimony was false.

### Fraudulently Inducing Settlement

140.     Nicole Burg also assisted the Debtor in inducing the Thoennesses to settle the state court lawsuit and compromise their claim under false pretenses. As detailed above, on May 17, 2022, the Debtor convinced the Thoennesses to settle minutes before trial without telling them that he had already started preparations to close Birchwood, disburse its assets, and file for personal bankruptcy. As this Court found in the Trial Order: "In point of fact, [the Debtor] never intended to follow through on the settlement." (Trial Order p. 7).

141.     Nicole Burg knew of the settlement, yet actively assisted the Debtor in closing Birchwood, disbursing its assets, and helping to conceal assets in advance of his bankruptcy filing.

142.     In the months leading up to the May 2022 trial date and settlement, Nicole Burg systematically withdrew all funds from her separate Stearns bank account, to ensure they did not become part of the Debtor's bankruptcy estate. Between December 2021 and May 2022, she withdrew $62,136.80.

ACTIVE 698437430v2

143.    On May 18, 2022—just one day after the Debtor induced the Thoennesses to settle—Nicole Burg caused Birchwood Technology to issue $7,753.39 of refunds to its customers.  Acting at the Debtor's direction, she entered the payments into the company's QuickBooks system and created the checks.  A QuickBooks report with these refunds is attached as **Exhibit 14**.

144.    Later, on May 25, 2024, Nicole Burg caused Birchwood to issue about $44,556 of severance payments to Birchwood's employees.  At the Debtor's direction, she entered the payments into the company's QuickBooks system and created the checks.  She also received a $4,200 severance payment and the Debtor received a $4,430 severance payment.  Birchwood records evidencing Nicole Burg's participation in the issuance of the severance payments are attached as **Exhibit 15**.

145.    In the Trial Order, the Court confirmed Nicole Burg's involvement, finding: "The Debtor, or his spouse–acting as directed by the Debtor, voluntarily drained Birchwood of cash in the lead up to filing for bankruptcy by paying for personal expenses through Birchwood or by issuing severance payments and refunding customers in preparation for bankruptcy." (Trial Order, p. 15).

## H.    Nicole Burg Played an Important and Necessary Role in the Fraudulent Scheme

146.    Over the course of more than four years, the Debtor and Rodenwald had numerous conversations with the Thoennesses regarding improving the DSCR so that Birchwood could again make payments to the Thoennesses under the Subordination Agreement.  In each of these conversations, the Debtor and Rodenwald misrepresented their desire to improve the DSCR and misled the Thoennesses as to the actual DSCR.  Even though Rodenwald and the Burgs diverted millions of dollars in cash from Birchwood, the business still performed at a level sufficient to

meet the DSCR (if adjusted to account for the unreported revenue and improper expenses). Nicole Burg enabled and assisted in the fraudulent scheme directed at the Thoenneses.

147.    Rodenwald and the Debtor also misrepresented Birchwood's compliance with the restrictive covenants under the SPA. Restricting the expenses that Birchwood could incur without the consent of the Thoenneses and requiring that the Debtor operate Birchwood in the same manner as the Thoenneses operated Birchwood before the sale to the Debtor are fundamental provisions of the SPA and other Sale Documents. Nicole Burg knew of the restrictions in the SPA and worked closely with the Debtor and Rodenwald to conceal the breaches under the Sale Documents, including the "consulting" fees paid to Rodenwald and free work for Rodenwald and his business enterprise.

## COUNT 1
### Avoidance and Recovery of Salary
#### Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550
#### Plaintiff:  Trustee
#### Defendant:  Nicole Burg

148.    All paragraphs in this complaint are incorporated by reference as if set forth herein.

149.    From 2017 through 2022, Birchwood Electric paid Nicole Burg $159,622 in salary.

150.    Birchwood Electric, as an alter ego of the Debtor, paid such salary to his spouse with actual intent to hinder, delay, or defraud the Thoenneses, who were and are creditors of the Debtor. The salary was part of the Debtor's fraudulent scheme to divert cash from Birchwood, lower Birchwood's DSCR calculation below 1.25x, and conceal funds, all to avoid paying amounts owing to the Thoenneses under the Note. As detailed above, Nicole Burg's employment was pretextual. Her sole focus was coordinating free services, deleting invoices and estimates, and diverting funds. And by paying her a salary, the Debtor was able to increase Birchwood's expenses and reduce the company's DSCR.

151.    Defendant Nicole Burg was the initial transferee of all salary payments.

40

152.     Birchwood Electric did not receive reasonably equivalent value from Nicole Burg in exchange for the salary.

153.     The Debtor attempted to conceal the true nature and intent of the salary from the Thoennesses.

154.     Because the salary went to the Debtor's wife, the Debtor retained possession and control of the funds.

155.     Nicole Burg is an insider of the Debtor and the Birchwood Entities.

156.     The Thoennesses did not discover, and could not have discovered, the fraudulent scheme to hinder, defraud, or delay them until May 2022, at the earliest.

157.     The Thoennesses have an allowed unsecured claim against the Debtor, and Birchwood Electric is an alter ego of the Debtor.  Accordingly, the Trustee may stand in the Thoennesses' shoes under 11 U.S.C. § 544(b) and avoid the salary payments made by Birchwood Electric to Nicole Burg under Minn. Stat. § 513.44(a)(1).

158.     Based on the foregoing, all salary payments made by Birchwood Electric to Defendant Nicole Burg are avoidable as fraudulent transfers under Minn. Stat. § 513.44(a)(1).  The Trustee may avoid and recover such fraudulent transfers from Nicole Burg.

**COUNT 2**
**Avoidance and Recovery of Cash Transfers**
**Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550**
**Plaintiff:  Trustee**
**Defendant:  Nicole Burg**

159.     All paragraphs in this complaint are incorporated by reference as if set forth herein.

160.     Nicole Burg received two large cash transfers from Birchwood Electric, totaling $33,800.  On January 10, 2020, Nicole Burg received $10,800, purportedly in exchange for a van that she sold to Birchwood Electric.  However, the van had limited value.  And on February 13, 2020, Nicole Burg received a $23,000 check from Birchwood Electric for no consideration, which

41

she deposited into her separate accounts at Stearns Bank. She then transferred the $23,000 to Rodenwald, for sheltering in real estate investments.

161. Birchwood Electric, as an alter ego of the Debtor, made such transfers to Nicole Burg with actual intent to hinder, delay, or defraud the Thoennesses, who were and are creditors of the Debtor. The transfers were part of the Debtor's fraudulent scheme to divert cash from Birchwood, lower Birchwood's DSCR calculation below 1.25x, and conceal funds, all to avoid paying amounts owing to the Thoennesses under the Note. The $10,800 van payment depressed Birchwood's DSCR, and the $23,000 transfer looted Birchwood of assets.

162. Defendant Nicole Burg was the initial transferee of the transfers.

163. Birchwood Electric did not receive reasonably equivalent value from Nicole Burg in exchange for the transfers.

164. The Defendants attempted to conceal the true nature and intent of the transfers.

165. Because the transfers went to the Debtor's spouse, the Debtor retained possession and control of the funds.

166. Nicole Burg is an insider of the Debtor and the Birchwood Entities.

167. The Thoennesses did not discover, and could not have discovered, the fraudulent scheme to hinder, defraud, or delay them until May 2022, at the earliest.

168. The Thoennesses have an allowed unsecured claim against the Debtor, and Birchwood Electric is an alter ego of the Debtor. Accordingly, the Trustee may stand in the Thoennesses' shoes under 11 U.S.C. § 544(b) and avoid the $33,800 of transfers made by Birchwood Electric to Nicole Burg under Minn. Stat. § 513.44(a)(1).

42

169.     Based on the foregoing, the $33,800 of transfers made by Birchwood Electric to Defendant Nicole Burg are avoidable as fraudulent transfers under Minn. Stat. § 513.44(a)(1). The Trustee may avoid and recover such fraudulent transfers from Nicole Burg.

### COUNT 3
### Avoidance and Recovery of Grubworm Interest
### Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550
### Plaintiff: Trustee
### Defendant: Nicole Burg

170.     All paragraphs in this complaint are incorporated by reference as if set forth herein.

171.     In or around March 2018, the Debtor formed Grubworm and gave Nicole Burg a 50% membership interest in the entity for no consideration.

172.     The Debtor transferred such membership interest to his spouse with actual intent to hinder, delay, or defraud the Thoenneses, who were and are creditors of the Debtor. The transfer was part of the Debtor's fraudulent scheme to divert cash from Birchwood, lower Birchwood's DSCR calculation below 1.25x, and conceal funds, all to avoid paying amounts owing to the Thoenneses under the Note. The Debtor and Rodenwald created Grubworm as a vehicle to launder money from Birchwood and conceal it through real estate and cryptocurrency investments. Nicole Burg did not contribute capital or any other value in exchange for her 50% membership interest. Instead, the Debtor transferred the interest to Nicole Burg to create another avenue to siphon money outside the Thoenneses' reach.

173.     Nicole Burg was the initial transferee of the transfer.

174.     The Debtor did not receive reasonably equivalent value from Nicole Burg in exchange for the transfer.

175.     The Defendants attempted to conceal the true nature and intent of the transfer.

176.     By making his wife a nominal co-owner, the Debtor retained possession and control of her 50% membership interest in Grubworm.

43

177.     Nicole Burg is an insider of the Debtor.

178.     The Thoenneses did not discover, and could not have discovered, the fraudulent scheme to hinder, defraud, or delay them until May 2022, at the earliest.

179.     The Thoenneses have an allowed unsecured claim against the Debtor.  Accordingly, the Trustee may stand in the Thoenneses' shoes under 11 U.S.C. § 544(b) and avoid the Debtor's transfer of a 50% interest in Grubworm to Nicole Burg under Minn. Stat. § 513.44(a)(1), or any rights to property owned by Grubworm.

180.     Based on the foregoing, such transfer is avoidable as fraudulent transfers under Minn. Stat. § 513.44(a)(1).  The Trustee may avoid and recover such fraudulent transfer from Nicole Burg.  Alternatively, pursuant to Minn. Stat. § 513.47(a), § 513.48(b), and § 513.48(c), the Trustee may avoid and recover Nicole Burg's actual membership interests in Grubworm.  The Trustee also may recover any interest from sale of the Grubworm property in Osakis, Minnesota, which property has been sold and proceeds from the sale are held by the Trustee.

## COUNT 4
### Avoidance and Recovery of Homestead Transfers and Exemptions
### Minn. Stat. §§ 513.44(a)(1), 513.47, 513.48 and 11 U.S.C. §§ 544(b), 550
### Plaintiff:  Trustee
### Defendants:  Travis Burg and Nicole Burg

181.     All paragraphs in this complaint are incorporated by reference as if set forth herein.

182.     Under Minn. Stat. § 510.01 *et seq*., a husband and wife, as debtors, may collectively claim a $480,000 exemption in their homestead.   However, a creditor may avoid this homestead exemption if the debtors fraudulently transferred non-exempt property into their exempt homestead with intent to defraud, delay, or hinder creditors.  *See In re Tveten*, 402 N.W.2d 551 (Minn. 1987).

183.     The Debtor and Nicole Burg co-own the Avon Property, and list it as their homestead.

44

184.    In his bankruptcy petition, the Debtor claimed a $55,000 homestead exemption for the Avon Property, which represents his unencumbered equity in the property.

185.    As detailed above, Birchwood Electric performed services at the Avon Property, valued at $62,194.59, which improved the property.  Thus, Birchwood Electric had rights to payment from the Burgs totaling $62,194.59, which were assets of Birchwood Electric.  However, Birchwood Electric never collected or enforced such rights to payment.  Instead, Birchwood Electric waived or cancelled such rights to payment, which constituted transfers by Birchwood Electric to the Defendants (the "Free Service Transfers").

186.    As detailed above, the Birchwood Entities directly paid at least $24,415.06 to third-party contractors, who performed services at and improved the Avon Property (the "Direct Payment Transfers").  As the owners of the Avon Property, the Burgs were the intended beneficiaries of these transfers.

187.    As detailed above, Birchwood Electric and Birchwood Technology "traded" at least $112,963.39 of services with other contractors in exchange for work on the Avon Property.  Specifically, the Birchwood Entities performed services for these contractors valued at $112,963.39, and had corresponding rights to payment from these contractors, which were assets of the Birchwood Entities.  However, rather than collect payment, the Birchwood Entities engaged in trades:  the Birchwood Entities waived or cancelled the rights to payment, and, in exchange, the contractors performed services at and improved the Avon Property.  Each waiver or cancellation of a right to payment constituted a transfer by the Birchwood Entities to the applicable contractor (the "Trade Transfers").  As the owners of the Avon Property, the Defendants were the intended beneficiaries of such transfers.

45

188. The Birchwood Entities, as alter egos of the Debtor, made the Free Service Transfers, Direct Payment Transfers, and Trade Transfers to or for the benefit of the Debtor and Nicole Burg with actual intent to hinder, delay, or defraud the Thoenneses, who were and are creditors of the Debtor. The transfers were part of the Debtor's fraudulent scheme to divert cash from Birchwood, lower Birchwood's DSCR calculation below 1.25x, and conceal funds, all to avoid paying amounts owing to the Thoenneses.

189. By causing Birchwood to perform or trade services relating to the Avon Property— but then waive or cancel the rights to payment (*i.e.,* make the Free Service Transfers and Trade Transfers)—the Debtor fraudulently depressed Birchwood's DSCR calculation. Likewise, by causing Birchwood to directly pay third-party contractors for improvements to the Avon Property (*i.e.*, make the Direct Payment Transfers), the Debtor fraudulently depressed Birchwood's DSCR calculation. And because these transfers stemmed from or resulted in improvements to the Avon Property, the Defendants were able to convert non-exempt Birchwood assets into their asserted exempt homestead, in furtherance of their scheme to defraud, hinder, and delay the Thoenneses. By intentionally transferring Birchwood's assets into the Avon Property, the Defendants attempted to shelter such assets from the Thoenneses via their asserted homestead exemptions.

190. The Burgs, as the owners of the Avon Property, were (a) the initial transferees of the Free Service Transfers and (b) the intended beneficiaries of the Direct Payment Transfers and the Trade Transfers.

191. The Burgs attempted to hide and conceal such transfers by deleting, modifying, or falsifying Birchwood's books and records.

192. All equity in the Avon Property is attributable to the Free Service Transfers, Direct Payment Transfers, and Trade Transfers.

ACTIVE 698437430v2

193.    The Trustee has not concluded the meeting of creditors for the Debtor under 11 U.S.C. § 341.

194.    Nicole Burg is an insider of the Debtor and the Birchwood Entities.

195.    The Debtor is an insider of the Birchwood Entities

196.    The Debtor and Nicole Burg were not good faith transferees.

197.    The Thoennesses did not discover, and could not have discovered, the Debtor's fraudulent scheme to hinder, defraud, or delay creditors until May 2022, at the earliest.

198.    The Thoennesses have an allowed unsecured claim against the Debtor, and the Birchwood Entities are alter egos of the Debtor.  Accordingly, the Trustee may stand in the Thoennesses' shoes under 11 U.S.C. § 544(b) and avoid and recover the Free Service Transfers, Direct Payment Transfers, and Trade Transfers from the Debtor and Nicole Burg under Minn. Stat. § 513.44(a)(1).

199.    Additionally, the Debtor's and Nicole Burg's homestead exemptions in the Avon Property are avoidable by the Trustee, and should be avoided, under 11 U.S.C. § 544(b), Minn. Stat. § 513.44(a)(1), and *In re Tveten*, 402 N.W.2d 551 (Minn. 1987).

**COUNT 5**
**Reduction of Homestead Exemption**
**11 U.S.C. § 522(o)**
**Plaintiff:  Trustee**
**Defendants:  Travis Burg and Nicole Burg**

200.    All paragraphs in this complaint are incorporated by reference as if set forth herein.

201.    Under 11 U.S.C. § 522(o)(4), "the value of an interest in . . . real or personal property that the debtor or a dependent of the debtor claims as a homestead . . . shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay,

47

or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of."

202.    The Debtor and Nicole Burg co-own the Avon Property, and it is their homestead.

203.    In his bankruptcy petition, the Debtor claimed a $55,000 homestead exemption for the Avon Property, which represents his unencumbered equity in the property.

204.    The Trustee has not concluded the meeting of creditors for the Debtor under 11 U.S.C. § 341.

205.    As detailed above, the Birchwood Entities, as alter egos of the Debtor, made the Free Service Transfers, Direct Payment Transfers, and Trade Transfers to or for the benefit of the Debtor and Nicole Burg with actual intent to hinder, delay, or defraud the Thoennesses, who were and are creditors of the Debtor.  These dispositions were part of the Debtor's fraudulent scheme to divert cash from Birchwood, lower Birchwood's DSCR calculation below 1.25x, and conceal funds, all to avoid paying amounts owing to the Thoennesses.

206.    By causing Birchwood to perform or trade services relating to the Avon Property— but then waive or cancel the rights to payment (*i.e.,* make the Free Service Transfers and Trade Transfers)—the Debtor fraudulently depressed Birchwood's DSCR calculation.  Likewise, by causing Birchwood to directly pay third-party contractors for improvements to the Avon Property (*i.e.*, make the Direct Payment Transfers), the Debtor fraudulently depressed Birchwood's DSCR calculation.  And because these dispositions stemmed from or resulted in improvements to the Avon Property, the Defendants were able to convert non-exempt Birchwood assets into their asserted exempt homestead, in furtherance of their scheme to defraud, hinder, and delay the Thoennesses.  By intentionally transferring Birchwood's assets into the Avon Property, the Debtor

48

and Nicole Burg ensured such assets would be shielded from the Thoennesses via their homestead exemption.

207.    The Birchwood Entities, as alter egos of the Debtor, made the Free Service Transfers, Direct Payment Transfers, and Trade Transfers within the 10-year period ending on the Petition Date.

208.    The assets that the Birchwood Entities disposed of via the Free Service Transfers, Direct Payment Transfers, and Trade Transfers were not exempt assets.

209.    The Thoennesses did not discover, and could not have discovered, the Debtor's fraudulent scheme to hinder, defraud, or delay creditors until May 2022, at the earliest.

210.    Pursuant to 11 U.S.C. § 522(o), the Debtor's and Nicole Burg's homestead exemptions in the Avon Property should be reduced in an amount to be determined at trial.

**COUNT 6**
**Objection to Homestead Exemption**
**Federal Rule of Bankruptcy Procedure 4003(b)(1)**
**Plaintiffs:  Trustee and Thoennesses**
**Defendant:  Travis Burg**

211.    All paragraphs in this complaint are incorporated by reference as if set forth herein.

212.    In his bankruptcy petition, the Debtor claimed a $55,000 homestead exemption for the Avon Property, which represents his unencumbered equity in the property.

213.    Under Federal Rule of Bankruptcy Procedure 4003(b)(1), "a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded."

214.    The Debtor's meeting of creditors under 11 U.S.C. § 341 has not yet concluded.

215.    As set forth in Count 4 of this complaint, the Debtor's homestead exemption in the Avon Property is avoidable under 11 U.S.C. § 544(b), Minn. Stat. § 513.44(a)(1), and *In re Tveten*, 402 N.W.2d 551 (Minn. 1987).

49

216. Additionally, as set forth in Count 5 of this Complaint, the Debtor's homestead exemption in the Avon Property is subject to reduction under 11 U.S.C. § 522(o).

217. Accordingly, pursuant to Federal Rule of Bankruptcy Procedure 4003(b)(1), the Thoennesses and the Trustee each object to the Debtor's claimed homestead exemption for the Avon Property.

218. The Thoennesses and the Trustee are entitled to an order finding and concluding that the Debtor cannot claim an exemption in the Avon Property.

**COUNT 7**
**Objection to Homestead Exemption**
**Federal Rule of Bankruptcy Procedure 4003(b)(2)**
**Plaintiffs: Trustee**
**Defendant: Travis Burg**

219. All paragraphs in this complaint are incorporated by reference as if set forth herein.

220. In his bankruptcy petition, the Debtor claimed a $55,000 homestead exemption for the Avon Property, which represents his unencumbered equity in the property.

221. Under Federal Rule of Bankruptcy Procedure 4003(b)(2), "the trustee may file an objection to a claim of exemption at any time prior to one year after the closing of the case if the debtor fraudulently asserted the claim of exemption."

222. As set forth in Count 4 of this complaint, the Debtor's homestead exemption in the Avon Property is avoidable under 11 U.S.C. § 544(b), Minn. Stat. § 513.44(a)(1), and *In re Tveten*, 402 N.W.2d 551 (Minn. 1987).

223. Additionally, as set forth in Count 5 of this complaint, the Debtor's homestead exemption in the Avon Property is subject to reduction under 11 U.S.C. § 522(o).

224. Accordingly, pursuant to Federal Rule of Bankruptcy Procedure 4003(b)(2), the Trustee objects to the Debtor's claimed homestead exemption for the Avon Property as fraudulently asserted. As noted above, all the Debtor's equity in the Avon Property is attributable

50

the Free Service Transfers, Direct Payment Transfers, and Trade Transfers. And the Debtor orchestrated such transfers with actual intent to hinder, defraud, or delay the Thoennesses by converting non-exempt Birchwood assets into his homestead.

225. The Trustee is entitled to an order finding and concluding that the Debtor cannot claim an exemption in the Avon Property.

**COUNT 8**
**Aiding and Abetting Fraud**
**Plaintiffs: Thoennesses**
**Defendant: Nicole Burg**

226. All paragraphs in this complaint are incorporated by reference as if set forth herein.

227. The Debtor committed a fraud that harmed the Thoennesses. As set forth above, the Debtor intentionally manipulated and misrepresented Birchwood's DSCR in support of his and Rodenwald's scheme to stop payments on the Note, divert funds and other assets from Birchwood, and shelter assets from the Thoennesses. Without limitation, the Debtor repeatedly and falsely told the Thoennesses that he and Rodenwald were working to improve the DSCR and to pay down the Note, when in fact they were doing precisely the opposite. The Debtor misrepresented and hid from the Thoennesses his and Rodenwald's efforts to artificially depress the DSCR and siphon funds from Birchwood, including by concealing the true purpose of Consulting by Wade and the existence of Grubworm.

228. The Debtor knew that the misrepresentations to the Thoennesses were false and intended the Thoennesses to act in reliance on the misrepresentations.

229. The Debtor's misrepresentations were material.

230. The Thoennesses actually and reasonably relied on the Debtor's misrepresentations.

231. Defendant Nicole Burg had knowledge of the Debtor's fraud.

232. Defendant Nicole Burg substantially assisted the Debtor's fraud.

51

233. As a direct and proximate result of the Debtor's and Nicole Burg's conduct, the Thoennes have suffered damages in an amount to be determined at trial.

## COUNT 9
### Aiding and Abetting Fraud
### Plaintiffs: Thoenneses
### Defendant: Nicole Burg

234. All paragraphs in this complaint are incorporated by reference as if set forth herein.

235. As detailed above, the Debtor fraudulently induced the Thoenneses to settle the state court lawsuit and compromise their claim. The Debtor falsely represented to the Thoenneses and the state court that he wanted to settle the dispute and would pay the Thoenneses $900,000, including $480,000 in cash by June 16, 2022. However, these representations were knowingly false. The Debtor had already started planning to close Birchwood, disburse its assets, conceal his own assets, and file for personal bankruptcy. The Debtor never intended to honor the settlement. As this Court found: "In point of fact, [the Debtor] never intended to follow through on the settlement." (Trial Order p. 7).

236. The Debtor knew that his misrepresentations to the Thoenneses were false and intended the Thoenneses to act in reliance on the misrepresentations.

237. The Debtor's misrepresentations were material.

238. The Thoenneses actually and reasonably relied on the Debtor's misrepresentations.

239. Defendant Nicole Burg had knowledge of the Debtor's fraud.

240. Defendant Nicole Burg substantially assisted the Debtor's fraud.

241. As a direct and proximate result of the Debtor's and Nicole's conduct, the Thoennes have suffered damages in an amount to be determined at trial.

52

## COUNT 10
### Aiding and Abetting Tortious Interference with Contract
### Plaintiffs:  Thoenneses
### Defendant:  Nicole Burg

242.    All paragraphs in this complaint are incorporated by reference as if set forth herein.

243.    The SPA, Note, Subordination Agreement, and other Sale Documents were valid and enforceable contracts between and among the Debtor, Birchwood, and the Thoenneses.

244.    Before Rodenwald's fraudulent scheme with the Debtor, the Debtor operated the Birchwood Entities consistent with past practices and the restrictive covenants in the SPA and other Sale Documents.  Among other things:  (a) the Debtor's salary was consistent with salaries paid by the Thoenneses for comparable work; (b) the Debtor did not take any equity draws from Birchwood unless the debt to the Thoenneses was current; (c) the Debtor did not cause Birchwood to pay personal income taxes, retirement contributions, or excessive personal expenses; (d) the Debtor did not cause Birchwood to provide free services to Rodenwald and entities controlled by Rodenwald for his own personal investment purposes; (e) the Debtor did not cause Birchwood to provide free services to friends and family; (f) the Debtor did not cause Birchwood to trade services with other contractors; (g) the Debtor did not cause Birchwood to modify, delete, or conceal business records; (h) the Debtor did not cause Birchwood to pay sham "consulting" fees and rent to Consulting by Wade; (i) the Debtor did not cause Birchwood to siphon funds into real estate and cryptocurrency investments; (j) the Debtor did not enrich himself at the expense of Birchwood's creditors; and (k) the Debtor did not cause Birchwood to create, incur, or assume expenses or indebtedness in excess of $5,000 in any fiscal year without the prior written consent of the Thoenneses.

ACTIVE 698437430v2

245.	After engaging Rodenwald and Consulting by Wade as a "consultant," the Debtor violated the terms of the SPA by failing to operate the Birchwood Entities "as previously operated, substantially in the form and manner as previously operated."

246.	After engaging Rodenwald and Consulting by Wade as a "consultant," the Debtor violated the terms of the SPA by causing the Birchwood Entities to engage "in other business activity without the prior written consent" of the Thoennesses.

247.	After engaging Rodenwald and Consulting by Wade as a "consultant," the Debtor violated the terms of the SPA by causing or allowing the Birchwood Entities to "create, incur, or assume expenses or indebtedness" in excess of $5,000 in any fiscal year without the prior written consent of the Thoennesses.

248.	After engaging Rodenwald and Consulting by Wade as a "consultant," the Debtor caused or allowed the Birchwood Entities to provide false and misleading financial statements to Falcon Bank and the Thoennesses reflecting a DSCR calculation below 1.25x, which enabled the Debtor to stop making payments on the Note as required by the Subordination Agreement.

249.	The Debtor and Rodenwald reviewed the SPA, Subordination Agreement, Note, and other Sale Documents with attorney Donahue and knew of the terms and conditions, including the restrictive covenants and restrictions on payments to the Thoennesses under the Subordination Agreement and other Sale Documents.

250.	The Debtor breached and caused the Birchwood Entities to breach the terms of the Sale Documents, including the SPA, Subordination Agreement, and Note.

251.	Rodenwald had knowledge of the SPA, Subordination Agreement, Note, and other Sale Documents.

ACTIVE 698437430v2

252. Rodenwald intentionally procured the Debtor's and the Birchwood Entities' breaches of the Sale Documents, including the SPA, the Subordination Agreement, and Note, without justification, and he personally benefited from such breaches.

253. Defendant Nicole Burg had knowledge of Rodenwald's tortious interference with the Sale Documents.

254. Defendant Nicole Burg substantially assisted Rodenwald's tortious interference with the Sale Documents, including the SPA, Subordination Agreement, and Note.

255. Defendant Nicole Burg benefited from her substantial assistance of Rodenwald tortious interference.

256. As a direct and proximate result of Nicole Burg's conduct, the Thoennesses are entitled to damages in an amount to be determined at trial.

## V.　　PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against Defendants Travis Burg and Nicole Burg as follows:

A. Avoid the fraudulent transfers alleged herein and grant their recovery from Defendants as set forth herein;

B. Order Defendant Nicole Burg to turnover or disgorge to the Trustee her membership interests in Grubworm, and any proceeds from sale of any Grubworm property;

C. Avoid Defendants' homestead exemptions in the Avon Property on account of the fraudulent transfers alleged herein;

D. Reduce Defendants' homestead exemptions in the Avon Property pursuant to 11 U.S.C. § 522(o) in an amount to be determined at trial;

55

E.      Sustain Plaintiffs' objections to the Debtor's claimed homestead exemption in the Avon Property under Federal Rule of Bankruptcy Procedure 4003(b)(1) and 4003(b)(2);

F.      Enter judgment in Plaintiffs' favor against Defendant Nicole Burg for their claims alleged herein and award Plaintiffs monetary damages in an amount to be proven at trial;

G.      Award Plaintiffs their fees, costs, disbursements, and expenses, including reasonable attorneys' fees;

H.      Award Plaintiffs pre- and post-judgment interest to the greatest extent allowed by law; and

I.      Grant any other relief that may be just, proper, and equitable.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

Dated:  May 15, 2024                      */e/ Michael B. Fisco*
_____
Michael B. Fisco (#0175341)
Michael M. Krauss (#0342002)
Peter D. Kieselbach (#0397531)
Carlos A. Alonso Gayon (#0504548)
90 South Seventh Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 259-9700
Email: fiscom@gtlaw.com
        kraussm@gtlaw.com
        kieselbachp@gtlaw.com
        carlos.alonsogayon@gtlaw.com

*Attorneys for Plaintiffs Erik A. Ahlgren, as chapter 7 trustee, and Rachel and Tony Thoennes*

56